Joseph J. Turner v. Commissioner.
Turner v. Commissioner
Docket No. 1203-67.
United States Tax Court
T.C. Memo 1969-240; 1969 Tax Ct. Memo LEXIS 57; 28 T.C.M. (CCH) 1252; T.C.M. (RIA) 69240; November 10, 1969, Filed *57 Edward S. Smith, Albert S. Barr, III and William Waller, American Trust Bldg., Nashville, Tenn., for the petitioner. Jack D. Yarbrough, for the respondent. KERN Memorandum Findings of Fact and Opinion Respondent determined a deficiency of $4,541.16 in petitioner's income tax for the year 1963. The only issue for our consideration is whether the gain realized by petitioner on the sale on July 9, 1963 of shares of Northwestern National Life Insurance Company common stock is taxable as ordinary income as gain from the sale of "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business," [1] rather than as long term capital gains as reported by petitioner in his income tax return for the year 1963. The sale was made by or on behalf of a group or organization, hereinafter sometimes referred to as the "second syndicate," which included as a member Alex. Brown & Sons, a partnership engaged in the securities business, of which petitioner was a general partner. The deficiency at issue resulted from respondent's determination that petitioner's distributive share of the gain realized by the Alex. Brown & Sons partnership from the second syndicate's *58 sale of some of the Northwestern National Life Insurance Company common stock constituted ordinary income rather than capital gain. This case was tried on the same calendar with Francis C. Currie and Eleanor B. Currie, et. al., docket Nos. 3190-67, 3226-67 and 3227-67, and Harry Lahman and Rose A. Lahman, docket No. 1971-67, involving the same issue and, in the main, the same facts. Most of the testimony and several of the exhibits which were made a part of the record of the above-named cases were received during the trial of the instant case. It is stipulated by the parties that the testimony and exhibits which were received during the trial in the instant case would be considered as evidence in the Currie and Lahman cases subject to objections on the grounds of relevancy and materiality. Findings of Fact Some of the facts are stipulated. They are found to be as stipulated and the stipulation, together with the exhibits indentified therein are incorporated herein by this reference. Petitioner Joseph J. Turner is an unmarried individual who resides in *59 Baltimore, Maryland. Petitioner timely filed his federal income tax return for the calendar year 1963 with the district director of internal revenue, Baltimore, Maryland. At all times here relevant, petitioner was a general partner of Alex. Brown & Sons. Alex. Brown & Sons was and is a partnership engaged in the securities business. It is a member of the New York Stock Exchange and it is registered with the Securities and Exchange Commission as a brokerdealer. Alex. Brown & Sons became a "Class B" participant in the second syndicate. J. C. Bradford & Co. (hereinafter sometimes called "Bradford & Co.") is a 1253 partnership engaged in the securities business, and is a member of the New York Stock Exchange. Bradford & Co. was a member of the National Association of Securities Dealers (hereinafter sometimes called the NASD) and has been registered with the Securities and Exchange Commissioner (hereinafter sometimes called the SEC) as a broker-dealer at least since February 4, 1945. James C. Bradford (hereinafter sometimes called "J. C.") IS A SENIOR AND PRINCIPAL PARTNER OF Bradford & Co. J. C. has been in the securities business for 41 years. Bradford & Co. was formed in 1927 and first *60 acquired its seat on the New York Stock Exchange in 1930. J. C. and Bradford & Co. have been very active in life insurance company stocks during the years J. C. and Bradford & Co. have been in business. J. C. has advertised Bradford & Co. as "Specialists in Life Insurance Stocks" in a book entitled "Security Dealers of North America" published semi-annually by Standard and Poor's Corporation which is circulated among securities dealers and in which securities dealers, underwriters and investment bankers place advertisements. The names of the partners in Bradford & Co. during the years 1961, 1962, and 1963 are listed below. J.C.
Gordon Brooks
Einer Nielsen
Gordon Duval
Kenneth H. Wood
David Steine
James C. Bradford, Jr.
A. S. Hill
Mrs. Eleanor A. Brad- ford, Trustee
W. M. Robinson
J. C. Bradford & Co., Incorporated (hereinafter sometimes referred to as "Bradford, Inc.") was incorporated under the laws of the State of Tennessee; and its principal office and place of business is located in Nashville, Tennessee. All of the outstanding stock of Bradford, Inc., was owned by Bradford & Co. Bradford, Inc. was a member of the NASD and was registered with the SEC as a broker-dealer in 1961. The corporation *61 Bradford, Inc., was occasionally used as an underwriter of corporate securities. Bradford, Inc., was registered with the State of Tennessee regulatory agency as a broker-dealer. It was not a member of the New York Stock Exchange. During the years 1961, 1962, and 1963 the officers of Bradford, Inc., were as follows: Office
Name
President
J. C.
Vice Presidents
Einer Nielsen
Walter M. Robinson
Kenneth H. Wood
Gordon Brooks
Gordon Duval *
David Steine *
Albert S. Hill *
Secretary
J. C. Bradford, Jr.
Treasurer
Mary Smart Aragon Corporation (hereinafter sometimes referred to as "Aragon") is a Tennessee corporation; and its principal office and place of business is in Nashville, Tennessee. All of the stock of Aragon is owned by the 418 Union Street Corporation, the stock of which, in turn, was owned by Eleanor A. Bradford, the wife of J. C., and by three partners of Bradford & Co. Nationwide Corporation (hereinafter sometimes referred to as "Nationwide") was incorporated under the laws of the State of Ohio. Nationwide conducts a life insurance business. Its principal office was located in Columbus, Ohio. Nationwide owned or controlled several other life insurance companies during *62 the years 1961 to 1963, inclusive. Northwestern National Life Insurance Company of Minneapolis, Minnesota (hereinafter sometimes referred to as "Northwestern") was organized in 1885 under the laws of the State of Minnesota, Northwestern is a stock and mutual life insurance company and is controlled jointly by its stockholders and its mutual policyholders. Each participating policyholder has one vote for each $1,000 of life insurance carried. As of March 31, 1963, its life insurance in force exceeded $2,700,000,000 and its total assets exceeded $420,000,000. During a period of approximately two months, i. e., in December 1956 and January 1957, Nationwide acquired approximately 51 percent of the outstanding common stock of Northwestern by purchase on the open market. It was acquired from small investors and from owners of large blocks of Northwestern stock. Murray D. Lincoln, the president of Nationwide, requested that J. C., as an official of Bradford & Co., assist Nationwide in its acquisitions of the stock of Northwestern. J. C. was aware that there had been litigation between Nationwide and Northwestern after Nationwide's acquisition of Northwestern's stock, arising from Nationwide's *63 efforts to gain the proxies of Northwestern's participating policyholders. At that time J. C. believed that the dispute between Northwestern and Nationwide depressed the market price of Nationwide's stock. He believed that if Bradford & Co. acquired an option to purchase the Northwestern stock 1254 owned by Nationwide and it became known that Nationwide would no longer own stock in Northwestern, the price of Northwestern stock would rise. J. C. was also aware that the 51 percent stock interest, represented by 113,728 shares of Northwestern common stock, did not provide control of Northwestern because of the votes of the participating policyholders. With these considerations in mind J. C. made an offer in mid-1961 to Mr. Lincoln, the president of Nationwide, to purchase an option to acquire Nationwide's stock interest in Northwestern. After some discussion and negotiation, the Board of Directors of Nationwide authorized the acceptance of J. C.'s offer. The negotiations culminated in an option agreement in the form of a letter dated September 18, 1961 from Nationwide addressed to Bradford & Co. which stated that upon payment of $3.00 per share for the 113,728 shares owned by Nationwide *64 on or before October 12, 1961, Bradford & Co. would have the option to purchase the Northwestern stock for $153 per share on or before October 31, 1962. The payment of $3.00 per share, totaling $341,184, was to be applied to the purchase price on exercise of the option. The market price of Northwestern at the time the option was granted was approximately $123 per share. After J. C. received the option letter from Nationwide, but before it was made effective, J. C. requested a meeting with John S. Pillsbury, the president of Northwestern, with whom he was not yet acquainted. Among the reasons which J. C. had for requesting that meeting was to establish a relationship between the management of Northwestern and the first syndicate which would be more friendly than the relationship between Northwestern and Nationwide, which had been distinctly unfriendly. After this meeting and until the 1963 sale of the Northwestern stock here at issue, J. C. and Pillsbury met and corresponded frequently. On or about October 9, 1961, J. C. organized a syndicate (hereinafter sometimes referred to as "first syndicate") which made the payment needed to purchase the option and to keep the option in force *65 until October 31, 1962. Listed below are the members of the first syndicate and the share participation of each member. Share
Syndicate Member
Partici-
pation
J. C. Bradford
36,228
Eleanor A. Bradford, Trustee for Eleanor B. Currie
3,000
J. C. Bradford & Co., Incorporated
2,500
James C. Bradford, Jr
6,000
Gordon Brooks
2,000
Gordon Duval
2,000
Albert S. Hill
1,000
Mrs. Helen G. Kyes
500
Roger M. Kyes
500
Einer Nielsen
7,000
R. T. Smith
5,000
David Steine
3,000
William Waller
2,000
Kenneth H. Wood
6,000
Bradford Associates 37,000
Total
113,728 The "Syndicate Agreement" dated October 9, 1961 and signed by each member of the first syndicate stated that while the option was taken in the name of Bradford & Co., Bradford & Co. was only the managing agent for each of the members of the first syndicate. Under the Agreement Bradford & Co. was authorized to sell or assign each member's share of the option to an underwriting group or to any other purchaser at such price and upon such terms as it might determine, subject to the prior written consent of that member. As shown above, J. C. and most of his partners in Bradford & Co. were members of the first syndicate. The syndicate members known as "Bradford Associates" were employees *66 of Bradford & Co. who were advised by the managers of Bradford & Co.'s various offices that Bradford & Co. was organizing the syndicate. J. C. agreed to let each of these employees who were made members of Bradford Associates participate in the syndicate to the extent of 1,000 shares of the stock covered by the option. Each Bradford & Co. employee participating in the syndicate through Bradford Associates signed a document dated October 6, 1961 entitled "Joint Venture Agreement" and paid certain amounts to an appointed agent. From the time of his first meeting with Pillsbury, J. C. was making plans for the eventual sale of the option by the first syndicate. At their first meeting J. C. discussed with Pillsbury the possibility of having Northwestern split its stock. Pillsbury advised him that it was not permitted under Minnesota law. Pillsbury also advised J. C. that a bill had been submitted to the Minnesota legislature in 1959 which would allow such a stock split, but because 1255 of Nationwide's opposition the bill had been withdrawn. Pillsbury further advised J. C. that the bill could not be brought up again for another year because the legislature was not in session. Because of *67 the impossibility at that time of having a stock split, J. C. then suggested the possibility of creating a voting trust in which the Northwestern stockholders might place their stock and might receive in return certificates evidencing participation in fractional shares of Northwestern. No action was taken on this proposal. After six months had elapsed from the time the option was purchased by the first syndicate, J. C. began discussions with Lehman Brothers, a securities dealer specializing in underwriting activities, with a view to the sale of the first syndicate's option. It was contemplated that Lehman Brothers, acting as "managing underwriter," would organize a group of securities dealers, or "underwriters," who would purchase and exercise the first syndicate's option and thereafter make a public offering of the Northwestern shares. A document entitled "Preliminary Prospectus" [2] dated June -, 1962, was prepared which recited the transaction described above and which stated that Lehman Brothers was the managing underwriter. In the latter part of May 1962, the stock market fell rapidly. The market price of *68 Northwestern shares also fell during the general market decline. At that time Lehman Brothers advised J. C. that because of the market decline the first syndicate would not be able to make a profit on the transaction. Lehman Brothers thereupon withdrew from the plan that was described in the "Preliminary Prospectus" dated June -, 1962. J. C. thereupon contacted Lehman Brothers again to see if that firm would be interested in organizing a syndicate to buy and hold the stock rather than distribute it. Lehman Brothers advised J. C. that they were not interested in such an arrangement. J. C. then went to Loeb, Rhoades & Co., another securities dealer specializing in underwriting activities, to see if they would be interested in organizing a syndicate to exercise the option and hold the stock. Loeb, Rhoades was no more interested in this plan than Lehman Brothers. J. C. also offered the option to another insurance company, American General Insurance Co., but American General declined the offer because they did not wish to buy themselves into a fight for control of Northwestern. Finally by late August in 1962, following a rise in the stock market, [3] J. C. succeeded in organizing a new syndicate, *69 the second syndicate, which was to acquire from the first syndicate and then to exercise the option to purchase the 113,728 shares of Northwestern common stock. The second syndicate included all of the members of the first syndicate, who were to hold a 50 percent interest in the second syndicate and were denominated "Class A" members, and new members, who were denominated "Class B" and "Class C" members. The Class B members included several individuals and five brokerage firms who were members of the NASD, three of which were also member firms of the New York Stock Exchange. Two life insurance companies, Reserve Life Insurance Company and Old Line Life Insurance Company, were the Class C members. As a matter of convenience to separate the affairs of the two syndicates Bradford, Inc., rather than Bradford & Co., was made the manager of the second syndicate. In forming this syndicate, J. C. contacted some individuals personally; the others were contacted by partners of Bradford & Co. and by other members of the first syndicate. However, J. C. was the primary negotiator in forming the second syndicate and was the individual who made the major decisions in connection with the second syndicate. *70 In August 1962, William J. Price III, one of the general partners of Alex. Brown & Sons, learned of the proposed second syndicate. Mr. Price and certain of his other partners thoroughly examined the proposal. After making inquiries and discussing it among themselves, they decided, as they had authority so to do, to have the firm participate in the second syndicate. During that time petitioner was out of the country on vacation; he was informed of his partners' decision on his return. The Syndicate Agreement, pursuant to which the members of the second syndicate had agreed to acquire the Northwestern stock optioned to the first syndicate, was in the form of a letter dated August 30, 1962, addressed by each member to Bradford, Inc. A copy of the Syndicate Agreement was executed by Alex. Brown & Sons, as a 1256 "Class B" participant for 2,500 shares of the Northwestern stock. There was also an acknowledgement of the receipt of a $125,000 cash deposit, a $4,296.48 interest payment, and a note to the order of Aragon Corporation in the amount of $312,500 made by Alex. Brown & Sons. Alex. Brown *71 & Sons complied with the formal requirements of section 1236(a)(1) of the Internal Revenue Code of 1954 in that the Northwestern stock was clearly identified in the firm's records as securities held for investment prior to the 30th day after its acquisition. Upon execution of the letter agreements by all members of the second syndicate, Bradford & Co. assigned the option to purchase the Northwestern stock to Aragon. In practically simultaneous transactions Aragon exercised the option and purchased the Northwestern stock from Nationwide, and immediately sold the stock to the second syndicate. In consideration for the stock, the amount of $2,193,200 was paid in cash to Aragon (at the rate of $50 per share on their participations) by the Class B members. The $341,184 previously paid by the Class A members for the option was credited on the purchase price. The remainder of the purchase price ($14,866,000) was evidenced by promissory notes executed by the Class A and Class B members, dated September 1, 1962 and payable on or before three years from date to the order of Aragon, and by certain guaranty agreements executed by the Class C members. Aragon delivered the cash to Nationwide and *72 executed a promissory note dated September 1 and payable on or before three years from date to the order of Nationwide in the total amount of the notes to the order of Aragon received from the syndicate members. An agreement between Aragon and Bradford, Inc. acknowledged receipt of the Northwestern stock on behalf of the second syndicate. Thereafter the Northwestern stock, the guaranty agreements, and the notes executed by each syndicate member to the order of Aragon were deposited with Nationwide as collateral securing the payment of Aragon's note payable to the order of Nationwide. Aragon was used in this transaction at the request of Nationwide, since under Ohio insurance law it was to Nationwide's advantage to own a note signed by a five year old corporation rather than notes signed by individuals or other entities. The transaction is outlined in an Agreement between Aragon and Bradford, Inc., dated September 5, 1962, as follows: 1. Aragon has this day purchased from Nationwide Corporation, an Ohio corporation with principal office and place of business in Columbus, Ohio, hereinafter referred to as Nationwide, 113,728 shares of the capital stock of Northwestern National Life Insurance *73 Company hereinafter referred to as Northwestern, at $153 per share, all of which has been paid in cash with the exception of $14,866,000, and for said amount Aragon has executed its promissory note dated September 1, 1962, payable on or before three (3) years from date, with interest at 5 1/2% per annum, payable quarterly in advance. Aragon hereby sells and delivers to Bradford said 113,728 shares of Northwestern stock, and Bradford acknowledges receipt of same, for and on behalf of participants of a syndicate of which Bradford is manager. Bradford will have said shares transferred into the name of J. C. Bradford & Co. (a partnership), and said shares, endorsed by (or accompanied by stock powers executed by) J. C. Bradford & Co., shall be held by Nationwide as security for the payment by Aragon on its aforesaid promissory note in the principal amount of $14,866,000. On behalf of the participants in the syndicate, of which Bradford is manager, it is agreed by Bradford that said shares shall be held by Nationwide under the terms and conditions set forth in the aforesaid note, a copy of which is annexed hereto marked Exhibit 1. * * * 3. Bradford may at any time notify Aragon of its desire *74 to sell all or a part of said shares of Northwestern stock, in which event Aragon agrees to cooperate fully with Bradford, to the end that said shares may be sold free and clear of all liens, with good title delivered to the purchasers, and the proceeds of sale applied to the payment of the special obligation notes of participants, to effect the release of the guaranty agreements of participants, and to the payment of any and all obligations on which said shares, or any interest therein, may be pledged or assigned as security (including Aragon's aforesaid note given to Nationwide in part payment for the stock), in accordance with the respective interests and liabilities of the participants. In 1963 J. C., acting this time on behalf of the manager of the second syndicate, Bradford, Inc., negotiated again with Lehman Brothers with a view to the organization by the latter of a group of securities 1257 underwriters who might buy the Northwestern stock, or a part of it, in order to make a public offering. Such an underwriting group was in fact formed by Lehman Brothers. Lehman Brothers thereafter undertook registration of the stock with the SEC. The second syndicate had nothing to do with *75 the selection of the members of the underwriting group, other than Lehman Brothers, and had nothing to do with the preparation and filing of the registration statement other than to provide the information under the caption "Selling Stockholders" in the prospectus and to pay certain expenses. On May 1, 1963, the Northwestern stock was split 8 for 1. Thereafter the second syndicate owned 909,824 shares of Northwestern. The following undated letter was mailed to each member of the second syndicate by Bradford, Inc., concerning a proposal to sell approximately two-thirds of the Northwestern stock: J. C. Bradford & Co. Incorporated Investment Bankers 414 Union Street Nashville, Tenn.
To the Members of the Northwestern National Life Insurance Company Syndicate Effective May 1, the stock of Northwestern National was split 8 for 1, and we have been studying the market action of the stock to determine whether this is a proper time to market syndicate shares. We believe that a complete sellout by the syndicate of the 909,824 shares now owned, which would involve an offering of more than $30 million, would adversely affect the offering price. We, therefore, propose that the syndicate sell approximately *76 two-thirds of these shares at a price not below $35 and retain the remaining one-third of the shares for later sale or for eventual distribution to the owners. A sale of two-thirds of the shares at 35 would realize enough profit to pay in full the notes to Aragon Corporation, recover for each participant the amount of his original deposit and provide sufficient additional cash to pay the capital gains tax incurred. That we may be prepared to take advantage of favorable market conditions and to move promptly for registration, we request that you execute and return to us the enclosed letter of authorization in duplicate and the questionnaire in triplicate, retaining one copy of each for your files. We will keep you fully informed. Yours very truly, J. C. BRADFORD & Co., INCORPORATED Subsequently a majority in interest of the participants in the second syndicate signed letters to the syndicate manager approving "a gross offering or sale price to the public of not less than $33.50 per share of the new stock," and approved the execution by the syndicate manager "of an Underwriting Agreement which contemplates an offering to the public of not less than this price." On June 29, 1963, the *77 syndicate manager wrote a letter to the SEC, saying in part: With respect to the inquiry in your letter of June 28th we are pleased to inform you, as agent for each of the selling stockholders, that the proposed sale is being made because it presents an opportunity to pay, in full, the note for the balance due on the purchase of the aggregate of 909,824 shares owned by the selling stockholders so that the balance of the shares will be owned free and clear for investment purposes. A prospectus dated July 2, 1963, was published and filed with the SEC concerning a public offering of 518,600 shares (after the 8 for 1 split) of the stock. Lehman Brothers was named therein as the managing underwriter. On July 2, 1963, an Underwriting Agreement was executed in the form of a letter addressed to Lehman Brothers by Northwestern [4] and Bradford, Inc., reciting that the latter signed "For the Selling Stockholders referred to in the Foregoing Agreement." Lehman Brothers was addressed "As Representative of the several Underwriters named in Schedule No. 1 hereof," which schedule listed 104 securities dealers throughout the United States, with their addresses and the number of shares to be purchased *78 by each. Schedule 2 listed as the Selling Stockholders the members of the second syndicate. The following are pertinent excerpts from the Underwriting Agreement: 3. Upon the basis of the representations and warranties herein contained, and subject to the terms and conditions herein set forth, the Selling Stockholders 1258 agree, severally and not jointly, to sell to the Underwriters, and the Underwriters agree, severally and not jointly, to purchase from the Selling Stockholders, at the price of $33.35 per share, the respective number of shares of the Stock set forth opposite the names of the Selling Stockholders in Schedule No. 2. The obligations of each Underwriter to each Selling Stockholder shall be to purchase from such selling Stockholder that number of shares which represents the same proportion of the number of shares set forth opposite the name of such Selling Stockholder in *79 Schedule No. 2 as the number of shares set forth opposite the name of such Underwriter in Schedule No. 1 hereto represents the total number of shares to be purchased by all Underwriters pursuant to this Agreement. The respective purchase obligations of each Underwriter, among the Underwriters, shall be rounded to avoid fractional shares, as the Representative may determine. * * * Nothing herein contained shall relieve any defaulting Underwriter of its liability, if any, to the Company and the Selling Stockholders for damages occasioned by its default hereunder. * * * 5. Certificates for the shares of Stock to be sold to the Underwriters by the Selling Stockholders hereunder shall be delivered by the Selling Stockholders to the Representative, for the account of the Underwriters, at the office of Lehman Brothers, 39 South La Salle Street, Chicago, Illinois, against payment therefor by certified or official bank checks payable in Chicago funds in amounts determined in accordance with Paragraph 3 hereof, drawn to the order of J. C. Bradford & Co., Incorporated (herein called the "Syndicate Manager"), on such date and at such time (such date and time being herein sometimes called the "date *80 of delivery") as shall be fixed by notice in writing to be given by the Representative to the Company and the Syndicate Manager, such date to be not less than five nor more than nine full business days after the date on which such notice shall have been given and not more than eleven full business days after the initial public offering of the Stock. The date of delivery may be postponed from time to time by mutual agreement of the Representative and the Syndicate Manager. Time shall be of the essence, and delivery at the time and place specified in this Agreement is a further condition of the obligations of each Underwriter. * * * 7. The Selling Stockholders, in proportion to the number of shares of the Stock which they are each selling to the Underwriters, hereby agree to pay all costs and expenses incident to the performance of their and the Company's obligations under this Agreement, including all expenses incident to the sale and delivery of the Stock to the several Underwriters, all transfer taxes in connection therewith, the fees and expenses of the Company's counsel and accountants, the costs and expenses incident to the printing of this Agreement, the preparing, printing and *81 filing under the Act of the Registration Statement (including all exhibits thereto), any Preliminary Prospectus, the Prospectus and, subject to the provisions of Paragraph 13 hereof, any amended or supplemented Prospectus, all expenses (including fees of counsel for the Underwriters and their disbursements) incurred in connection with any Blue Sky law qualifications and the preparation of a memorandum with respect thereto, and the cost of furnishing to the several Underwriters copies of the Registration Statement and Prospectus as herein provided, it being understood that, except as provided in this Paragraph 7 or in Paragraph 9 hereof, the Underwriters will pay all their own costs and expenses, including fees and expenses of their counsel, transfer stamp taxes on any Stock which they may sell, and any advertising expenses connected with any offering they may make. * * * 9. Anything herein to the contrary notwithstanding, if the Underwriters shall for any reason permitted under this Agreement decline to purchase the Stock, the Selling Stockholders will reimburse the several Underwriters for all out of pocket expenses (including the fees and disbursements of counsel) incurred by them *82 in connection with this Agreement and the proposed purchase of the Stock, and upon demand will pay the full amount thereof to you as Representative of the several Underwriters. Neither the Company nor the Selling Stockholders shall be required to pay any amount for any expenses of the Underwriters except as aforesaid or shall be liable, under any circumstances, to the Underwriters for damages on account of the loss of anticipated profits. Pursuant to the Underwriting Agreement, the sale of 518,600 shares to the underwriters was closed at Chicago, Illinois, on July 9, 1963. Simultaneously with the payment by the underwriters of the purchase price, the notes which had been executed by the members of the syndicate 1259 were paid and the Aragon note to Nationwide was paid. The excess cash after payment of expenses, and certificates for the shares of stock not sold were distributed to the members of the second syndicate in proportion to their respective interests. Thereafter the second syndicate engaged in no other transaction and was never reactivated for any purpose. The second syndicate was never registered with the SEC as a dealer or broker; it was never a member of the NASD; it was *83 never registered as a dealer in securities with any regulatory body of any state; it never paid any privilege tax or license fee of any kind to any state or political subdivision; it never engaged in any transaction of any kind other than the purchase of 113,728 shares of Northwestern National Life Insurance Co. stock on or about September 5, 1962, and the agreement for the sale of 518,600 shares on July 2, 1963, after the 8 for 1 split; it never owned or held any securities of any kind other than this Northwestern stock; it never owned or used any other property of any kind; it had no telephone or any mailing address or place of business in its name; it was not to be used for any transaction other than the one previously described involving the purchase and sale of the Northwestern stock. As we have already found, Alex. Brown & Sons from the outset recorded its interest in the Northwestern stock (20,000 shares after the 8 for 1 split) in a segregated and clearly identified investment account on its books. At no time did Alex. Brown & Sons carry this stock in its books of account as part of its inventory of securities held for sale to its customers in the ordinary course of its business *84 as a dealer in securities. On its 1963 partnership income tax return, Alex. Brown & Sons reported, as long term capital gain, a profit of $159,125.19 from the sale of 11,400 shares of common stock of Northwestern. Petitioner's distributive share of that profit was $9,547.51, and petitioner included this amount on his 1963 income tax return as part of his distributive share of Alex. Brown & Sons net long term capital gain. The 8,600 shares of Northwestern stock not sold by the second syndicate and distributed to Alex. Brown & Sons was still being held by that firm as an investment at the time of trial of this case. On January 10, 1967, respondent mailed a notice of deficiency to the petitioner for the calendar year 1963 as the result of treating the gain on the sale of the Northwestern stock as ordinary income rather than capital gain. The respondent, in amending paragraph 5(o) of his Answer to the petitioner's Petition, gave the following reason for his determination: 5(o) In further explanation of the determination of the respondent in the notice of deficiency, it is the position of the respondent that the stock of Northwestern National Life Insurance Company was not a capital asset *85 in the hands of the petitioner since petitioner was, for income tax purposes, a partner in the syndicate which was a partnership, and which partnership did not hold the stock for investment, but such stock was held by the syndicate-partnership primarily for sale to customers in the ordinary course of the partnership's and partners' trade or business. In the alternative, if the Court determines that the syndicate was not a partnership for income tax purposes, but was a form of co-ownership or sharing of expenses, then it is the respondent's position that each member of the syndicate, including the petitioner, held his stock primarily for sale to customers in the ordinary course of a trade or business; hence, the stock was not a capital asset in the hands of the petitioner. The second syndicate did not hold the Northwestern stock for sale to customers in the ordinary course of a trade or business. Alex. Brown & Sons did not purchase and at no time held its interest in the syndicate, or shares of Northwestern represented thereby, for sale to customers in the ordinary course of its trade or business. The stock sold through the syndicate by the Alex. Brown & Sons partnership, of which petitioner *86 was a partner, was a capital asset. Opinion KERN, Judge: In our opinion this case is not distinguishable from the case of Francis C. Currie and Eleanor B. Currie, Et Al., 53 T.C. -, in which our Findings of Fact and Opinion were filed on November 10, 1969. Although petitioner's partnership, a member of the syndicate here involved, was engaged in the securities business, was a member of the New York Stock Exchange and was registered with the SEC as a broker-dealer, we are convinced by the evidence that its interest in the Northwestern stock was acquired and held as an investment (see section 1236(a), Internal Revenue Code of 1954) and was not held 1260 for sale to its customers in the ordinary course of its business. In no realistic sense can it be said that the members of the underwriting group who purchased the Northwestern stock when the syndicate decided to liquidate a part of its investment therein were customers of either the syndicate or of petitioner's partnership to whom any sales were made by either in the ordinary course of its business. Nor can it be said that the syndicate or petitioner's partnership indirectly participated in any sales ultimately made by the members of *87 the purchasing group of underwriters to the general public. For the reasons stated by us in Francis C. Currie and Eleanor B. Currie, Et Al, supra, Decision will be entered for the petitioner. Footnotes
1. Section 1221(1), I.R.C. 1954↩. Hereafter all statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.
*. Elected on May 18, 1961.↩
2. The printer's proof of the "Preliminary Prospectus" was dated June 7, 1962.↩
3. On August 24, 1962, the market price per share of Northwestern stock "was in the area of $180."↩
4. Northwestern was a party to the Underwriting Agreement only because its stock was to be offered for sale in the public offering. Its undertakings therein were with regard to matters which might affect the validity of the stock and of its sale to or by the underwriters and which might affect its value.↩